# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

SHANICE HARMON,
Individually; LISA BATES,
Individually, and as Next
Friend for J.S.; LATORIA
SLAUGHTER, Individually,
and as Next Friend for M.S.;
BRENDA YOUNG, Individually,
and as Next Friend for A.P.

      Plaintiffs,

v.

COUNTRYSIDE ACADEMY;
BERRIEN RESA; BENTON
HARBOR AREA SCHOOLS;
AMERGIS STAFFING INC.;
BENTON CHARTER TOWNSHIP;
JULIANA PAUSTIAN, Individually
and in her Official Capacity; SARAH
BROOKSHIRE, Individually and in
her Official Capacity; ROBERT
COOK, Individually and in his Official
Capacity; OLIVIA MCCREVAN,
Individually and in her Official Capacity;
MARIA WOODRUFF, Individually and
in her Official Capacity; ELIZABETH
POCKRANDT, Individually and

Case No.

Hon. Chief Judge Hala Jarbou

in her Official Capacity; STEPHEN
G. CHAFFIN, Individually and in his
Official Capacity; Any as yet to be
Discover Parties.

        Defendants.

---

John R. Beason III, Esq.
The J.R. Beason Firm PLLC.
Attorney for the Plaintiffs
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com

(1)

## PLAINTIFFS' COMPLAINT AND REQUEST FOR DAMAGES

Plaintiffs, SHANICE HARMON, LISA BATES, J.S., LATORIA SLAUGHTER, M.S., BRENDA YOUNG, AND A.P., through counsel, brings this action for constitutional and federal law violations, namely: the First Amendment of the U.S. Constitution, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, Individuals with Disabilities Education Act, and the Rehabilitative Act, substantiating race, religious, and disability based discrimination, disparate treatment, gross negligence, exposure to hostile work and learning environments, and intentional race discrimination, conversion, assault, and infliction of emotional distress.  The Plaintiffs allege as follows:

2

(2)

## **INTRODUCTION**

This is a Civil Action asserting claims under constitutional and federal law, alleging violations of the federal Constitution; U.S. Const. amend. I, U.S. Const. amend. XIV, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, 42 U.S.C. § 2000e-3, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. § 12132, 42 U.S.C. § 12112(a), 29 U.S.C. § 794, MI CONST Art. 1, § 17, Mich. Comp. Laws § 380.10, and Mich. Comp. Laws § 380.1310b, substantiating and equating to racial animus discrimination, disability discrimination, conspiracy against civil rights, unlawful employment practices, disparate treatment, and gross negligence. Plaintiff requests a jury trial and seeks an award of compensatory and exemplary damages, as well as reasonable attorney fees and cost pursuant to the federal Constitution, 42 U.S.C. § 2000d, 42 U.S.C. § 2000e-2, 42 U.S.C. § 2000e-3, 42 U.S.C. § 12117, 29 U.S.C. § 794a(2), and 42 U.S.C. § 1983.

(3)

## **JURISDICTION AND VENUE**

This court has jurisdiction over all causes of action set forth in this complaint pursuant to 28 U.S.C. § 1331, as the plaintiff and the Defendants maintain a place

of business and commerce in the County of Berrien, in the State of Michigan.  The

occurrence of the significant and relevant incidents giving rise to this federal

question complaint took place in Benton Harbor, MI, County of Berrien, within the

jurisdiction of this Court.


(4)


**THE PARTIES**

The Plaintiffs are citizens of the State of Michigan and reside in the City of Benton

Harbor, County of Berrien.


(5)


The Defendants are corporate entities and natural persons within the State of

Michigan with the competency and capacity to sue and be sued.  At the time of the

alleged violations, the Defendants were residing and operating in Benton Harbor,

MI (Berrien County).  The Defendants maintain residences, schools, and operative

places of business in the Counties of Berrien and Kent, Michigan.


(6)


**FACTS GIVING RISE TO PLAINTIFF'S COMPLAINT**

Ms. Shanice Harmon began working for Defendants Countryside Academy through Amergis Staffing employment contracting service at the beginning of the 2024-2025 school year in September of 2024.  Ms. Harmon applied as an paraprofessional aide, but was instead offered a teaching position and assigned as the Special Education teacher for high school students in the Countryside Academy Special Education program.  As the special education teacher, Ms. Harmon was expected to implement "IEP" learning plans with disabled students, their parents, and support staff.

(7)

In 2021, it was reported that Berrien RESA had amassed over forty million dollars in special education funding that it began to redistribute to the families of special education students through supportive programming.  For the next several years, the Defendants implemented programs spending the access funds on materials that support the special education students and their learning.  For the 2024-2025 school year, the Defendants were granted nearly a million dollars, $952,390 in special education support funds from the State of Michigan.  Despite the surplus of funds and 2024-2025 replenishment, the Plaintiff was reprimanded by Defendant Brookshire on September 27th, 2024 via email.  The Defendant took issue with the

Plaintiff's spending on materials for her students.  Despite it being the Plaintiff's first month of being thrust into a role she did not apply for, Defendant Brookshire stated: "I've asked several times for a plan/budget.  The last shopping trip was way over budget."  She continued, stating that: "I really want to support you and this program but the school does not have money to waste."  The Defendants, after hiring a new special education teacher with no formal teaching experience, failed to provide her adequate guidance or directions and chided her for their failures in program structuring within her first few weeks of working with them.

(8)

The Plaintiff fastly found herself working in a hostile environment, primed by Sarah Brookshire and middle school education teacher Juliana Paustian, who took every opportunity to slight the Plaintiffs as not worthy of their respect and decency. Juliana Paustian, told Olivia McCrevan, the special education teachers' aide, and students, that Ms. Harmon was not a certified Special Education teacher and that they did not have to listen to her, intentionally circumventing her authority and burdening her ability to perform her teaching duties with co-worker McCrevan and students.

(9)

Juliana Paustian's racial animus overpowered her professionalism and she could not tolerate accepting and treating the Plaintiff as her co-worker and equal. Ms. Paustian was supposed to train the Plaintiff, but instead intentionally provided her with outdated and incorrect training materials. When Ms. Harmon requested the current and operating training materials and other needed resources, Juliana Paustian withheld the materials from the Plaintiff and her request for assistance went ignored. Despite only being a co-worker, on September 18th, 2024, Juliana Paustian entered the Plaintiff's classroom without permission and dismantled her work set-up, taking down decorations and reorganizing tables and desks in a classroom she had no authority in. On October 2nd, 2024, between 10:45 A.M. and 11:30 A.M., Ms. Harmon met with Elizabeth Pockrandt from Berrien RESA for an IEP training in the lunch area near her former classroom. Ms. Harmon broke down into tears explaining to Elizabeth how she had no help or structure in teaching or implementing the special-education programming. Ms. Harmon confided in Pockrandt about her feelings of not having the adequate resources or the support she needed, and also about feeling bullied by Defendant Paustian. Ms. Harmon explained that Paustian often refused to give her materials she needed for

the students stating that she was "the only one qualified" to handle the IEP related materials and would further refuse to assist her any IEP related matters with her students.  Ms. Harmon related to Pockrandt that she would prefer Kiersten Johnson train her, because she felt bullied and disliked by Defendant Paustian.  Elizabeth Pockrandt did not respond to the Plaintiff's crying for help; she listened, but was indifferent and unmoved by the Plaintiffs' plight or the status of the Berrien RESA special education programs.

(10)

On the morning of October 4th, 2024, in another training session, Juliana Paustian, without provocation, stated to Ms. Harmon that her work was only "worth coins", and proceeded to pull out a picture of a slave while laughing and giggling in her face.  Juliana Paustian asked another teacher, Kiersten Johnson, what the picture was doing there and she replied that it was likely from Black History Month and should be put with those supplies.  Juliana facetiously replied: "yea, that's the perfect place for it."  Juliana Paustian also brought up the private remarks Ms. Harmon stated while crying to Elizabeth Pockrandt about not having support and feeling bullied.  The Plaintiff understood Paustian's actions and behavior to be an open attack and an attempt to antagonize, harass, degrade, and infuriate her.

Unlike the Defendant, the Plaintiff handled herself and the flagrant mistreatment like a true professional; she took mental note of what happened and prepared to make a formal complaint at a later time.

(11)

Despite the behavior of the Defendant, the Plaintiff's primary focus was serving her students, who were excited about a field trip they had scheduled that morning to the local nature center.  Before the Plaintiff left for the trip, and after clearing all of the children out of her room, she placed her car and home keys in her top desk drawer, locked the classroom, and proceeded to Sarett Nature Center.  With the classroom locked and empty, only a few staff members in the school could access the classroom.  When the Plaintiff arrived at the Nature Center the kids set through an intro in the main lobby before following guides on the trail.  Because of a disability, the Plaintiff did not join the children on the trail, but instead stayed back in the main lobby while they enjoyed the scenic routes with the guides.  After the Plaintiff returned, Ms. Paustian came into her classroom and suggested that she should decorate her classroom to "resemble a jungle" further stating that it would be the "ideal look" for her class.  The Plaintiff gave her a blank stare, and walked away.  Defendant Paustian came back to the Plaintiff's classroom doorway and

blew kisses at her in an attempt to bait her into acting out of frustration and to antagonize her into rage.

(12)

Shortly after, at approximately 2:30 P.M., the Plaintiff realized her keys were missing from her top desk drawer.  The Plaintiff searched the drawer and the area around her desk to no avail.  She checked and rechecked the desk but the keys had vanished from the secure location she left them.

(13)

Around 2:40 P.M., Juliana Paustian came to Ms. Harmon's doorway as she was searching for her keys and mouthed "Good Luck!" The Plaintiff notified the office secretary and her classroom paraprofessional Defendant Olivia McCrevan via text message.  Despite being sure she left her keys in her desk drawer, the Plaintiff called Sarett Nature Center at 3:32 P.M. to inquire if her keys were there.  After being left on hold for about ten minutes, at 3:46 P.M., the Nature Center's staff confirmed that her keys were not on the premises and that they conduct sweeps each evening before closing.  The Plaintiff called her mother to explain that her keys went missing to request a ride home.  Around 4:00 P.M., Ms. Harmon emailed

the school's principal, Robert Cook, and Superintendent, Sara Brookshire, along with the school's secretary detailing the situation of her missing keys and the timeframe when they vanished.  Ms. Harmon also checked with Kirsten Johnson, a coworker she visited that morning between 8:20 A.M. and 9:45 A.M. before leaving for the field trip.  The Plaintiff also contacted her recruiter at Amergis to inform her about the situation.   At 4:11 P.M., Kirsten Johnson responded, confirming that she had not seen any keys.   As her coworkers left the school grounds, the Plaintiff stayed on the scene searching the property, including her classroom, the restrooms, the school van, and outdoor areas.   Around 4:50 P.M., Ms. Harmon's mother arrived and assisted her with her search.   Together, along with the night shift janitor, the three searched the classroom thoroughly.   The Plaintiff contacted the closest locksmith able to replace her car key "fob", which required a new device and reprogramming of the vehicle.   The appointment was scheduled for the next day.   After twenty to thirty minutes of searching, Ms. Harmon, her mother, and the night shift janitor conceded that the keys were not present on the school grounds.

(14)

At 11:25 A.M., on October 5th, 2024, Ms. Harmon sent a text to Defendant Robert Cook to inform him that she would be retrieving her car from the school grounds. Ms. Harmon met with the locksmith on the school grounds and completed reprogramming  her new key fob around 1:30 P.M.  The next day, the Plaintiff spoke with Officer Spencer of Benton Charter Township Police Department and detailed to her the specifics surrounding her keys going missing.  The Officer created a report and explained that they would meet her at the school on Monday, October 7th, 2024, to view the school's security surveillance footage.

(15)

On October 7th, 2024, Officer Stephen G. Chaffin came to Countryside Academy to investigate Benton Charter Township Report number "24-10123", and viewed surveillance footage of the Plaintiff's classroom while she was gone to the Sarett Nature Center field trip.  The Benton Charter Township Officer confirmed to the Plaintiff that Juliana Paustian was seen entering her classroom while she was gone to Sarett Nature Center and after making several flagrantly racist and obnoxious remarks to Plaintiff Ms. Harmon earlier that morning and after she returned. Officer Chaffin and Benton Charter Township police department refused to investigate any further into the matter after speaking with Juliana Paustian, despite viewing her enter the Plaintiff's classroom

(16)

According to Officer Chaffin, Defendant Paustian excused her entry into the Plaintiffs classroom by simply stating she had access because she is also a special education teacher.  Defendant Paustian did not offer a reason for entering the room because she did not have any resources or materials in the Plaintiffs room, no reason for being present in her space, and footage did not show her retrieving any noticeable materials.  Plaintiff Shanice Harmon asserts that Defendant Paustian had no reason to enter her classroom while she was not present.   Furthermore, Defendant Paustian did not mention entering the Plaintiffs classroom when she came by to mock her multiple times upon her return from Sarett Nature Center.

(17)

The surveillance camera in the Plaintiff's former classroom faces the front door of the classroom and not the teacher's desk.  Despite this, Juliana Paustian can be seen entering the classroom from the side door.  After viewing footage of Juliana Paustian being the only person to enter the Plaintiffs secured space while she was gone.   After viewing the footage, Officer Chaffin related what he saw to the Plaintiff, then had her leave the room while he questioned Juliana Paustian alone. Officer Chaffin was not aware of Juliana Paustian's racial bullying and baiting of the Plaintiff and he did not investigate beyond his one-on-one conversation with

co-defendant Paustian.   After speaking with Paustian alone, despite previously viewing her being the only person present and capable of stealing the Plaintiff's home and car keys, he unilaterally determined that Juliana Paustian did not "have a motive" to steal the Plaintiffs car keys.

(18)

Officer Chaffin stated to Plaintiff Harmon that Juliana Paustian entered her classroom through its sidedoor.  The Plaintiff asserts that this is a clear indicator of her attempting to avoid the front-door facing surveillance camera, which shows her nefarious intent.   Because the camera still recorded Juliana Paustian in her classroom, the Plaintiff asserts that Robert Cook, Sara Brookshire, and the school's resource officer conspired and viewed the footage without her knowledge and in her absence.  Several employees in the school viewed the footage while the most interested party, the Plaintiff, was intentionally kept in the dark, forcing her to call the police, who also denied her right to an unbiased investigation into the theft of her keys on school grounds.

(19)

On Friday, October 11th, 2024, an agent from Amergis Staffing called Ms. Harmon and explained that Countryside Academy officials told her that the Plaintiffs keys were left at Sarett Nature Center.  Ms. Harmon retorted that her keys were never

present at Sarett Nature Center and the Countryside was attempting to cover-up the theft.  Amergis's agent responded: "I'm going to speak with them on Monday; it just seems like a lot for them to cover-up", clearly dismissing the Plaintiff's allegations.  After completing her shift, the Plaintiff went to the nature centre to retrieve her keys and speak with the Center's director about how her keys showed up on their site after not being there for days.  The Plaintiff spoke with a manager who was present when the keys were left at the Center.  She stated that a man who did not sign in on their records, and who was essentially trespassing, delivered the keys to their front desk and stated that he found them on the trails.  The Plaintiff reiterated that she had not brought her keys nor ventured onto the nature trails when her class visited for their field-trip.  According to the Plaintiffs recorded conversation at Sarett Nature Center, the manager never actually got the opportunity to inform anyone at Countryside that the keys had been found.  She stated that she attempted to send an email to Defendant McCrevan, but that it was still in her drafts, and that she tried to call the school but got no answer and the voicemail was not set-up for her to leave a message.  The next shift the Plaintiff worked at Countryside though, Defendant Sarah Brookshire entered her classroom and asked if keys had been "dropped-off" and if they were "Chevy keys?"  The Plaintiff asserts that because the Nature Center did not relay the message, there was

no plausible explanation for how Sarah Brookshire knew the keys were "dropped-off" other than her own role in orchestrating their delivery to the Nature Center after her co-worker stole them from the Plaintiff's classroom. The Plaintiff asserts that the Nature Center manager reached out to Defendant McCrevan because she contacted the center about her keys without her knowledge and despite claiming to not be involved in the matter.

(20)

Ms. Harmon continued to suffer discrimination and a hostile work environment, as the Defendants further withheld needed work materials and the janitor stopped cleaning her classroom. Ms. Harmon's new key-fob also began to malfunction and randomly fails to read the new key and oftentimes will not start. A couple of weeks after Defendant Juliana Paustian was confirmed to be present in the Plaintiffs classroom, Countryside Superintendent Sarah Brookshire began to attempt to create a pretextual excuse for her presence. Defendant Brookshire sent out an email stating that there was a "Black Metal Cabinet" in the Plaintiffs former classroom that was being "used" to store "all the extra manipulatives for the SPED teachers", and that the cabinet was initially left in the Plaintiffs classroom because they were not sure about the layout for the middle school classroom, and requested Jake to move the cabinet to room "112." The Plaintiff replied, questioning,

"wasn't this cabinet given to me?"  Ms. Harmon further clarified: "that's why it was here. The things I have in it came from the Modular's."  The Plaintiff maintains that there were no shared materials in the "black metal cabinet", that the cabinet came from the "modular building" across the street from the school, and that she retrieved materials to be used in her classroom while Countryside staff were disposing of them.   There were no shared materials in Ms. Harmon's high school special education class that were needed by or reserved for the middle school special education class or Defendant Juliana Paustian.  Everything that Ms. Harmon possessed in the black metal cabinet had been discarded by Juliana Paustian and other teachers.   Sarah Brookshire's email attempting to create a pretextual excuse for Juliana Paustian's entry and presence in the Plaintiff's classroom clearly indicated her collaboration and acquiescence to the Juliana Paustian's theft of her personal property and attempts to use racial tropes to enrage her in the workplace.

(21)

The hostile, racially charged mistreatment of the Plaintiff peaked with the theft of her keys and cover-up that followed, causing her anxiety issues to worsen.  Ms. Harmon also continued to have issues with her insubordinate paraprofessional Olivia McCrevan, who had several confrontational issues bullying students.

Defendant McCrevan came to Ms. Harmon and attempted to dispel her involvement in the staff's conspiratorial attempts to make her leave, stating: "whatever you think is going on, I don't have anything to do with it." Ms. Harmon had not stated that she believed something was "going on", and interpreted McCrevan's statement as an admission that "something" was going on.

(22)

Olivia McCrevan verbally abused and assaulted several students yet had her behavior validated by Countryside Academy when they refused to protect their students from her violent outburst.  Plaintiff J.S., an autistic teen, alleges that Olivia McCrevan and several other Countryside staff members, including Defendant Superintendent Brookshire, participated in and acquiesced to the verbal and physical assaults and demeaning of him and his classmates. Olivia McCrevan assaulted J.S. by flinching towards him as if she was going to hit him on multiple occasions, and regularly created confrontational interactions by making false accusations and then violently yelling and screaming at J.S. when he defended himself or had any retort to her statements towards him.

(23)

J.S. feels that he and other students are treated differently because of their race, religious views, and disability status.  As a consequence, he has made several

complaints against teachers and staff over his years as a student.  On one occasion, J.S. went to Sarah Brookshire seeking bandaids to address a ringworm rash that was visible on his head.  Instead of addressing his needs, Mrs. Brookshire angrily directed J.S. to wash his hands and asked if he was contagious.  Later that day, when Mrs. Brookshire and Mrs. Hilliard saw J.S. in the hallway, they "scooted over" and acted as if they were scared to be near him to tease and taunt him for his sensitive skin issue.  The school leader and teacher acted out their antics in front of other students during a class passing period in a busy hallway.  J.S. informed Ms. Harmon and later his mother when he got home.

(24)

J.S. 's mother, Lisa Bates' issues with Countryside Academy and their mistreatment of her son spans back years.  In 2022 she took issue with the school's teaching of sexuality and encouraged her son to identify as homosexual in spite of his Christian faith and upbringing.   Mrs. Bates' position was that as long as her son was legally a minor in her custody, he would live by her rules.  The school's staff, in opposition to Mrs. Bates, insisted to encourage J.S. that he could identify as he liked and his mother had no parental or guardian right to stop him.  J.S. himself identifies as a devout Christian and was reprimanded multiple times for speaking about God and his religious beliefs during freetime in the classrooms.  J.S. was told

by a staff member that "this is not Sunday school" and that he and classmates could not talk about God in their freetime.  As a result of the sexuality suggestions and rampant unaddressed bullying from other students, the Plaintiff left Countryside and attended Niles High School in 2023, but was forced back to Countryside Academy for the 2024-2025 school year due to program change by Berrien RESA that eliminated the Plaintiff's IEP program at Niles High School.

(25)

Rampant bullying of disabled students at Countryside Academy was a constant issue for Ms. Harmon.  Defendant M.S. has multiple disabilities including one that causes her to use a feeding tube.  M.S. suffered severe unaddressed bullying at Benton Harbor Area Schools that caused her to transfer to Countryside Academy. In 2023, at Benton Harbor Area Schools, on separate occasions, M.S. was stabbed by another student and later drenched in water in a prank incident that was shared on social media.  M.S.'s history of abuse at Benton Harbor Area Schools spans back to her years as an elementary and middle school student.  In one incident, a BHAS teacher refused to allow M.S. to use the restroom, caused her to use urinate on herself, and then made a false allegation against her mother with CPS to cover-up the incident and retaliate against Plaintiff Latoria Slaughter for taking issue with the treatment of her child.  After M.S. was stabbed and humiliated on

social media in a viral video that reached her out-of-town family members, Ms. Latoria Slaughter removed her daughter from Benton Harbor Area Schools and enrolled her in Countryside Academy.

(26)

Unfortunately, M.S. did not receive better treatment or protection at Countryside Academy.   M.S. suffered several bullying incidents that were reported to the school's leadership, who eventually met with her mother and promised to provide a paraprofessional aide to join and protect M.S. during lunch.  Countryside Academy failed to keep their promise to Ms. Slaughter.  On October 29th, 2024, M.S. was tormented by other students during lunch and forced to crawl around and bark like a dog.  Again the bullying was recorded and posted to social media spreading across the district to family members in different cities.  When Ms. Slaughter came to the school to demand answers, consequences for the bullies, and protection for her vulnerable child, the Defendants, Brookshire and Principal Cook lied and stated to the Plaintiff that M.S. was attempting to "be funny" and entertain the other students.   To avoid taking accountability for their poor management, the Defendants chose to scapegoat a vulnerable disabled child.  Born premature, M.S. has survived several surgeries and still uses a feeding tube. The Defendants again promised to provide protection for M.S. at lunch, but have yet to do so.

(27)

Defendants Brookshire and Cook, as the schools official leaders, were participants in bullying and demeaning students.   Principal Cook asked J.S. why he hasn't "gone back" to Niles High School and Sarah Brookshire excused her degrading hallway antics and mistreatment of J.S. as "trying to build a relationship" with him. Defendants Brookshire and Cook participated in bullying students and attempted to cover-up the bullying of their disabled special education teachers by lying.  Ms. Harmon, unlike Countryside's officials, had been taking the calls of her student's parents and informing them about the incidents they sought information about. Ms. Harmon confirmed the bullying incidents that M.S. suffered to Ms. Slaughter, but when Ms. Slaughter stated so to the Defendants, Sarah Brookshire and Robert Cook retorted that Ms. Harmon was lying and that the incidents did not take place, despite the October 29th, 2024 incident being recorded and spreading on social media.

(28)

Ms.Harmon asserts that she did not lie about her students being bullied and that her entire class were witnesses to the sufferings of their classmates.  As Ms. Harmon continued to serve her students as best as she could, the Defendants continued to attempt to create pretext for her termination.   Ms. Harmon asserts that the

Defendants began accusing her of not properly signing documentation "tied" to their funding.  Ms. Harmon asserts that she was never told about the documents nor provided them before being accused of failing to properly fill them out and sign them.  Hillary Furney emailed the Plaintiff and accused her of not being present in her classroom and failing to return previous emails.  She went on to relay that "Worksheet B" was supposed to be turned in on "count day", that it was needed by an auditor and therefore potentially related to funding.

(29)

Ms. Harmon called the special education director Jennifer "Jenn" Peterson, but she only provided vague directions, stating that Ms. Harmon needed to "print it off and sign it", but gave no further directions about what exactly she would be signing. When Ms. Harmon again stated that she did not know anything about the document, Jennifer Peterson stated that she would print it off and bring it to her to sign, again avoiding the direct issue of what the document was about.  Ms. Harmon asserts that despite her attempts to get assistance, no one came to her classroom to explain the document or process.  Maria Woodruff, a coworker and Countryside Academy teacher, attempted to have the Plaintiff record a child as present and on her special classroom roll for count day.  The Plaintiff asserts that Maria Woodruff

and other Countryside agents intentionally manipulate and falsify special education, attendance, and count day records for pecuniary interest.

(30)

After ignoring Ms. Harmon's complaints and issues with her student's being bullied, Principal Cook came to Plaintiff with a false narrative of the bullying incidents that left out the promises that Oliva McCrevan would be shadowing M.S. to ensure she was not harassed by other students. Ms. Harmon and Ms. Slaughter assert Robert Cook lied and stated to Ms. Slaughter that the bullying incident did not take place in the gym during lunch but that it occurred in her classroom and that Ms. Harmon was fabricating the entire lunchroom bullying scenario.

(31)

Ms. Harmon spoke to Brenda Young about her daughter being bullied and mistreated as well. With several students and parents seeking protection from bullying, and the school's officials being active participants, Ms. Harmon contacted the schools Board of Directors about the bullying issues, but they never returned communications. Ms. Harmon was kept out of Countryside administrator meetings with her student's parents and the requested officials whom they sought to meet with, were not present. Mrs. Lisa Bates requested to meet with Olivia McCrevan,

who her son alleged assaulted him, and the Coordinator, Mrs. Emlong, but neither were ever present at any meetings with the Plaintiffs.

(32)

Ms. Harmon's anxiety and health issues increased due to the hostile work environment and extreme racial harassment she suffered at the hands of Juliana Paustian, and her supporters Sarah Brookshire, and Robert Cook.  At her doctor's suggestion, she organized a transfer from Countryside Academy in Berrien County, Michigan to work in South Bend, IN area schools.  When the news that November 22nd, 2024 would be her last day, the students reacted emotionally, prompting Olivia McCrevan to scream and berate them.  And again, Olivia McCrevan took the opportunity to assault J.S., screaming in his face violently and acting as if she was going to physically attack him.

(33)

Despite her time winding down, Ms. Harmon continued to serve her students and in turn, the students continued to make the most of their time with her.  Mrs. Harmon left her class during her planning hour to purchase materials for an upcoming art field trip and project.  Ms. Harmon purchased the materials from her personal funds due to Defendant Brookshire's abrasiveness and anger when she asked about a budget for her special education class.  After multiple incidents of

outbursts and assaults on students, Olivia McCrevan began refusing to be around the students alone.    Defendants Brookshire and Cook supported this insubordination, making work extremely difficult for the Plaintiff.    Because McCrevan was "uncomfortable" with the students, the Plaintiff gave her very specific directions of what to do in her absence.    The students were left with Defendant McCrevan for approximately ten minutes between 9:51 A.M. when they return from their first-hour physical education class, and 10:02 A.M. when the Plaintiff returned to her classroom.    In that short period of time with the students, Olivia McCrevan violently screamed at Plaintiff A.P. and other students, then proceeded to speak ill of Ms. Harmon with another teacher in front of her students, calling Ms. Harmon a "Bitch."    Defendant McCrevan's violent outburst and unprofessional antics caused A.P. to break down into tears.    The students who heard Olivia McCrevan call Ms. Harmon a "bitch" , informed Ms. Harmon when she returned.    Ms. Harmon emailed Defendant Robert Cook to explain the students' allegations about Olivia McCrevan.    Robert Cook did not address Ms. Harmon's issues about McCrevan, but ordered A.P. to be sent to his office.    Once A.P. arrived, Defendant Cook directed her not to inform her mother Brenda Young, who had previously directed her daughter to inform her if she continued to experience problems with Countryside's staff.    Mr. Cook reasoned with A.P. that "Olivia

wasn't ready to be alone with students."  Defendant McCrevan was sent home early that day, leaving the Plaintiff in the classroom for three hours without any support.  As days after the incident went on, Ms. Harmon continued to email Robert Cook and Sarah Brookshire attempting to schedule meetings to mediate the McCrevan issue, but they continued to ignore her communications.  Principal Cook and Superintendent Brookshire continued to avoid communication with A.P.'s mother Brenda Young.  The Defendants would create opportunities to communicate with Olivia McCrevan, pulling her out of class for long periods to chat.  Because Olivia McCrevan was in and out of the classroom and not an adequate professional or mature enough adult to be left alone with the students, the Plaintiff was forced to miss a training session.  When the Plaintiff informed Jennifer Peterson that she could not make the training due to lack of classroom support, she did not receive any assistance or accommodations and was not able to participate.

(34)

Ms. Harmon had been relaying her hostile work environment issues to her recruiter at Amergis, but her allegations of mistreatment were not taken seriously and Amergis never investigated her complaints or supported Ms. Harmon as she suffered in her Countryside Academy placement.  When the Plaintiff began adding

her legal counsel to emails to Countryside administrators, Sarah Baker of Amergis asserted that the Plaintiff was "risking her job."  When Sarah Baker got notice of Ms. Harmon's EEOC and Michigan Department of Civil Rights charges, she called the Plaintiff multiple times to chide her choice to pursue legal action.  When Sarah Baker spoke with the Plaintiff, she asked "why" she was suing, despite all of the complaints Ms. Harmony had previously relayed.  Sarah Baker minimized the harassment and theft of Ms. Harmon's keys, facetiously asking if she was suing "for a pair  keys??", and further stated: "I don't see what you're going to get out of that."  The Amerigis agent's multiple calls and derogatory sentiments served to intimate and dissuade the Plaintiff from pursuing legal recourse for her injuries. After the Plaintiff left Countryside Academy for South Bend, IN, schools, Amergis withheld funds from the Plaintiffs checks despite her working and earning the withheld pay.   Amergis' wrongful withholding of pay further increased the Plaintiffs anxiety as she became uncertain of her ability to meet various financial obligations.

(35)

After the Defendants became aware of the Plaintiffs' legal representation, Michigan Department of Civil Rights, and EEOC charge, J.S., M.S., and other students have reported continued mistreatment and bullying by Countryside staff

members and other students.  M.S. has not received her promised lunchroom aide and J.S. reports being picked-on by Ms. Harmon's replacement.  Mrs. Isom has suggested to J.S. what a "Christian" does and does not do.  J.S. reports that Mrs. Isom treats him and other students differently by selectively enforcing class rules and falsely accusing him of behaviors and actions he did not partake in.

(36)

Plaintiff Lisa Bates became aware of a special education program in which schools assist students with home appliances and other necessities, and began seeking information about the program from Countryside Academy officials.  Mrs. Bates has been consistently ignored by Countryside staff since she began seeking resolution of the mistreatment of her son.  In their attempts to avoid contact with Mrs. Bates, the Defendants denied her access to state and federally funded special education programs.  Mrs. Bates, Mrs. Young, and Ms Slaughter assert that their disabled minors J.S., A.P., and M.S. have been denied an adequate and appropriate education, access to federally funded special-education programs, and the proscribed equal enforcement of their rights under federal and state law.

(37)

**SPECIFIC ALLEGATIONS AGAINST ALL DEFENDANTS**

Countryside Academy established customs of racial animus and disability discrimination evidenced by its lead administrators participating in bullying, intimidating, and denying adequate learning environments for its Disabled Black American students.  Countryside administrators and employees evidenced  and acted pursuant to the school's customs of racial animus bullying and discrimination,  when its long-time teacher Juliana Paustian, superintendent, and principal acted to intimidate, torment, and belittle the Plaintiffs.  Countryside Academy acquiesced to the regular bullying and assaults of vulnerable disabled students by failing to protect the Plaintiffs from severe harassments and assaults by Countryside staff and students.  Countryside Academy denied the Plaintiffs access to the special education programming by failing to put families on notice about federally and state funded programs and refusing to provide information and guidance about participating in the special education support programs when the Plaintiffs requested it.  Countryside also attempted to manipulate attendance records by falsifying the presence of a student on "count day", when its agent Maria Woodruff directed Shanice Harmon to mark the absent student present in her special education class, despite him not being on her.   Countryside Academy acquiesced to the racial discrimination of its employees and denied the Parent-Plaintiffs the right to direct the education of their children when Principal

Robert Cook and Superintendent Sarah Brookshire collaborated in shielding Juliana Paustian from accountability for theft and directed A.P. not to inform her mother about Olivia McCrevan's assaultive screaming and cursing on school grounds.

(38)

Berrien RESA acquiesced to Countryside Academy's custom of racial animus and disability discrimination when its special education program director Elizabeth Pockrandt listened, ignored, and failed to take action when Ms. Harmon cried while explaining being bullied and lacking support at Countryside Academy. Berrien RESA has been or should have been on notice about extreme and severe bullying of disabled special education students but failed to take adequate action to enforce laws and policies to protect the Plaintiffs.

(39)

For several years, Benton Harbor Area Schools, through inadequate student management, allowed M.S. to be tormented by bullies and humiliated in their facilities, causing Plaintiff Latoria Slaughter to transfer her vulnerable child to Countryside Academy, where she was exposed to more harassment, humiliation,

and bullying due to Countryside Academy's customs of racial animus, disability animus, circumvention of laws, and egregiously poor student management.

(40)

Benton Charter Township acted pursuant to its custom of racial animus when its agent Officer Chaffin refused to perform an adequate investigation and initiate criminal charges against Juliana Paustian despite observing her enter and leave the Plaintiff's classroom within the timeframe that her keys went missing. Had Officer Chaffin investigated the situation instead of protecting Paustian with his personal conclusions, he would have learned that Plaintiff Harmon's conversation with Defendant Pockrandt about Paustian bullying her, was the motive for Juliana Paustian to retaliate by stealing Ms. Harmon's keys. Benton Charter Township denied Ms. Harmon equal protection under the law when its police department refused to adequately investigate the theft of her keys, despite Officer Chaffin observing evidence indicating Juliana Paustian.

(41)

Juliana Paustian acted out intentional racism and pursuant to a custom of racial animus and disability discrimination when she refused to provide student

documents to Ms. Harmon, made antagonizing racially charged comments about the Plaintiff's value, and stole her personal property in retaliation to Ms. Harmon's complaint to Berrien RESA's Defendant Pockrandt.  Juliana Paustian created a hostile work environment when she entered the Plaintiff's classroom and reorganized her set-up without permission or providing notice.  Defendant Paustian intensified the hostile work environment when she continued to deny the Plaintiff needed student documents and suggested she should decorate her special education class like a jungle to insult the Plaintiff and her Black American students with the intention of enraging Ms. Harmon into quitting or causing her own termination. Juliana Paustian collaborated with Olivia McCrevan, Sarah Brookshire, Robert Cooks, and Officer Chaffin to cover-up and escape accountability for stealing the Plaintiff's home and car keys out of her classroom desk.

(42)

Sarah Brookshire acted out intentional racism pursuant to a custom of racial animus and contributed to a hostile learning environment when she teased autistic student J.S. about skin rashes, lied to Plaintiff-Parents about their children being bullied, and assisted with orchestrating the "dropping-off" of Ms. Harmon's personal keys from the custody of Juliana Paustian to Sarett Nature Center to

cover-up Paustian's theft and harassment.  By failing to retain and adequately train a special education teacher while also failing to eradicate extreme bullying of disabled students and staff, Defendant Brookshire denied the Plaintiffs an appropriate, adequate, and tenable free learning environment and education.

(43)

Defendant Robert Cook acted out intentional racism pursuant to a custom of racial animus when he told J.S. that he should go back to Niles High School and ignored bullying complaints from the Plaintiff-Parents about Olivia McCrevan and unsupervised students.  Robert Cook contributed to a hostile work environment when he ignored Ms. Harmon's complaints of harassment, denied her adequate support, and collaborated with Juliana Paustian's theft by refusing Ms. Harmon's request to view the surveillance footage of her classroom.  Robert Cook's mismanagement of staff and students exposed the Plaintiffs to hostile learning and working environments that caused lasting injuries.

(44)

Olivia McCrevan acted out intentional discrimination and pursuant to a custom of racial animus when she assaulted and verbally abused Plaintiffs J.S. and A.P. and

collaborated with covering-up the theft Ms. Harmon's by making herself the contact person for Sarett Nature Center regarding the Plaintiff's missing keys. Olivia McCrevan acted out intentional discrimination and contributed to a hostile work and learning environment when she refused to work with the disabled Black American student-Plaintiffs without verbally abusing them.

(45)

Maria Woodruff contributed to a hostile work environment and acted pursuant to a custom of racial animus when she attempted to have the Plaintiff falsify count-day attendance records by marking an absent student who is not a special education program participant as present in her special education class on the student census recording day.

(46)

Elizabeth Pockrandt contributed and acquiesced to a hostile work environment while acting pursuant to a custom of racial animus when she ignored Ms. Harmon's complaints of bullying against the Defend Paustian and informed Juliana Paustian about Ms. Harmon's allegations.

(47)

Stephen Chaffin acted out intentional discrimination pursuant to Benton Charter Township's custom of racial animus when he refused to adequately investigate Ms. Harmon's allegations and initiate a prosecution against Juliana Paustian despite having sufficient evidence of her crime, thereby denying Ms. Harmon due process and equal protection under the law. Sarah Baker, Ms. Harmon's recruiter from Amergis Staffing acted pursuant to customs of racial animus when she dismissed the Plaintiff's claims of harassment and theft and refused to initiate formal complaint and grievance procedures.

(48)

## COUNT I. CUSTOMS OF RACIAL ANIMUS DISCRIMINATION:

### *Defendants – Countryside Academy, Amergis Staffing Inc., Berrien RESA, Benton Charter Township, Juliana Paustian, Sarah Brookshire, Robert Cook, Olivia McCrevan, Elizabeth Pockrandt, and Stephen G. Chaffin*

Plaintiffs, reallege paragraphs 1-47.

(49)

The Defendants violated 42 U.S.C. § 2000d, 42 U.S.C. § 2000e-2, 42 U.S.C. § 2000e-3, and 42 U.S.C. § 1981 when they acted pursuant to customs of racial

animus by habitually subjecting the Plaintiffs to racially charged and hostile learning and working environments and refusing to eradicate the issues when requested.

(50)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  "It shall be an unlawful employment practice for an employer- (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

(51)

"Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits race discrimination in "any program or activity receiving Federal financial assistance." It provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." § 2000d. Title VI, unlike Title VII, "prohibits only intentional discrimination." *Alexander v. Sandoval,* 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). *Hotchkiss v. Garno*, 883 F. Supp. 2d 719, 737 (E.D. Mich. 2012).

(52)

"Title VII applies to all discrimination in terms, conditions, privileges and opportunities for employment. *See* 42 U.S.C. § 2000e-2. "[I]t is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell-Douglas v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973)." *Brown v. Tennessee*, 693 F.2d 600, 603 (6th Cir. 1982).  *"McDonnell Douglas* requires a Title VII complainant to carry the initial burden of establishing a prima facie case of racial discrimination. "This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for

which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Id.'' Shack v. Southworth*, 521 F.2d 51, 56 (6th Cir. 1975).

(53)

"Discrimination claims under Title VII and § 1981 have the same elements and are, therefore, subject to the same analysis. See, e.g., *Brooks v. Dent,*795 F.Supp.2d 694, 699 (S.D. Ohio 2011). These provisions make it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin. Ibid. To prevail on these claims, Plaintiff must establish the following: (1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class." *Laster v. City of*

*Kalamazoo,* 746 F.3d 714, 727 (6th Cir. 2014). *DeLeon v. Teamsters Local 406,* 1:22-cv-903, at *4 (W.D. Mich. Oct. 16, 2023).

(54)

The Defendants violated Titles VI and VII of the Civil Rights Act of 1964 when they exposed the Plaintiffs to racially discriminatory hostile working and learning environments.

(55)

## COUNT II. INTENTIONAL DISCRIMINATION IN VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d

*Defendants – Countryside Academy, Amergis Staffing Inc., Berrien RESA, Benton Charter Township, Juliana Paustian, Sarah Brookshire, Robert Cook, Olivia McCrevan, Elizabeth Pockrandt, and Stephen G. Chaffin*

Plaintiffs reassert paragraphs 1-54.

(56)

The Defendants violated Title VI of the Civil Rights Act of 1964 when they acted pursuant to customs of racial animus that caused the verbal abuse and physical assaulting of students and an adverse employment action against the Plaintiff while participating in a federally protected policing and education programs.

(57)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

(58)

"Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits race discrimination in "any program or activity receiving Federal financial assistance." It provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." § 2000d. Title VI, unlike Title VII, "prohibits only intentional discrimination." *Alexander v. Sandoval,* 532 U.S. 275,

280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). *Hotchkiss v. Garno*, 883 F. Supp. 2d 719, 737 (E.D. Mich. 2012).

(59)

"Intentional discrimination may be inferred from "a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers,* 184 F.3d at 1153. "Deliberate indifference is more than a collection of sloppy, or even reckless, oversights." *Hill v. Bradley,* 295 Fed.Appx. 740, 742 (6th Cir.2008). *Velzen v. Grand Valley State Univ.*, 902 F. Supp. 2d 1038, 1046 (W.D. Mich. 2012).

(60)

The Defendants participated in racial animus based intentional discrimination when they collaborated in hiding Juliana Paustian's theft of Ms. Harmon's home and car keys, lied to parents about their children being bullied by staff and students, and denied Ms. Harmon and student Plaintiffs equal protection under the law by refusing to initiate a prosecution against Juliana Paustian and denying student Plaintiffs a free and adequate public education.

(61)

## COUNT III.  RACIAL DISCRIMINATION: FAILURE TO ENFORCE CONTRACTS DUE TO RACIAL ANIMUS IN VIOLATION OF 42 U.S.C. § 1981(b)

*Defendants – Amergis Staffing Inc., Berrien RESA, Countryside Academy*

Plaintiff realleges paragraphs 1-61.

(62)

The Defendants acted out racial discrimination when they failed to adhere to their work and program agreements with the Plaintiffs by refusing to implement their code of conduct, formal grievance processes, and denying these Plaintiffs access to special education support programs.

(63)

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. (b) "Make and enforce contracts" defined For purposes of

this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. (c) Protection against impairment–The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law. 42 U.S.C. § 1981.

(64)

"When a person sues under this statute to enforce his right not to be discriminated against in private employment, he must show that he was unable to make or enforce a contract that white citizens were able to make or enforce. Applied to the facts of this case, Appellee Long must show that he was forced to resign because of dissimilar treatment caused in part by his race. As originally designed in 1866, Section 1981 was intended to uproot the institution of slavery and to eradicate its badges and incidents. *See* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 422-437, 88 S.Ct. 2186, 20 L.Ed.2d 1189, (1968) (analysis applied to § 1981 in Tillman v. Wheaton-Haven Recreation Assn., 410 U.S. 431, 439, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973).) When an employer, public or private, places more stringent requirements on employees because of their race, Section 1981 is violated. The

purpose for which the Section was enacted — to afford equal opportunities to secure the benefits of American life regardless of race — requires that a court adopt a broad outlook in enforcing Section 1981. Schemes of discrimination, whether blatant or subtle, are forbidden." Newbern v. Lake Lorelei, Inc., 308 F. Supp. 407, 416 (S.D.Ohio 1968). *Cf.* Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939)." *Long v. Ford Motor Company*, 496 F.2d 500, 504-05 (6th Cir. 1974).

(65)

The Defendants violated Sec. 1981 of the Civil Rights Act of 1964 when their toleration of racial animus and egregious mistreatment of students caused the Plaintiffs to transfer and seek work and education elsewhere.

(66)

**COUNT IV. CONSPIRACY TO VIOLATE CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and 42 U.S.C. § 1986**

*Defendants – Countryside Academy, Berrien RESA, Benton Charter Township,*

*Juliana Paustian, Sarah Brookshire, Robert Cook, Olivia McCrevan, Elizabeth*

*Pockrandt, and Stephen G. Chaffin*

Plaintiffs reallege paragraphs 1-66.

(67)

The Defendants acted out a conspiracy against the rights of the Plaintiff when they colluded to confiscate her keys, intentionally inflict emotional distress, and avoid the legal ramifications of the theft after the fact by circumventing the legal process through selective enforcement of law and policy.

(68)

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.  "The rights protected by this section are

protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

(69)

"Depriving persons of rights or privileges: If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws….in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. 42 U.S.C. § 1985(3).

(70)

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action. 42 U.S.C. § 1986.

(71)

"A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Moore v. City of Paducah,* 890 F.2d 831, 834 (6th Cir. 1989); *Hooks v. Hooks,* 771 F.2d 935, 943-944 (6th Cir. 1985). In order to state a claim of civil conspiracy under § 1983, a plaintiff must show that there was a single plan, that the coconspirators shared in the objective of the conspiracy, violating the plaintiff's constitutional rights, and that an overt act was committed in furtherance of the conspiracy. *Moore,* 890 F.2d at 834; *Hooks,* 771 F.2d at 943-944. *Matthews v. McQuiggin*, No. 2:10-cv-145, at *13 (W.D. Mich. Aug. 29, 2011).   "The

elements of a conspiracy claim under 42 U.S.C. § 1985(3) do not merely require that an agreement be made for the purpose of depriving someone's constitutional rights. Rather, the conspiracy must exist for the purpose of depriving a person or class of persons of equal protection of the law. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005)." *Hanas v. Inner City Christian Outreach, Inc.*, 542 F. Supp. 2d 683, 695 (E.D. Mich. 2008).   The defendants created and acted out a single plan to wrongfully dispossess the Plaintiff of her home and car keys in a racial animus rooted harassment intended to intimidate and coerce Ms. Harmon into relinquishing her position as a high school special education program teacher.

(72)

## COUNT V. AMERICAN DISABILITIES ACT VIOLATION

**Defendants – *Countryside Academy, Berrien RESA, Benton Harbor Area Schools, Olivia McCrevan, Sarah Brookshire, and Robert Cook***

Plaintiffs reallege paragraphs 1-72.

(73)

The Defendants violated the American Disabilities Act when they exposed the Plaintiffs to bullying, assaults, and denied them a free and appropriate public education due to their status as disabled Black Americans.

(74)

"Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

(75)

"Both the ADA and the Rehabilitation Act combat discrimination against disabled individuals. *Gohl v. Livonia Pub. Schs. Sch. Dist.* , 836 F.3d 672, 681 (6th Cir. 2016). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. And the Rehabilitation Act provides that a qualified individual with a disability shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Both Acts allow disabled individuals to sue school districts that discriminate against them because of their disability." *M.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 452 (6th Cir. 2021).

(76)

"The ADA prohibits employment discrimination based on an employee's disability. Specifically, the ADA mandates that: "No covered entity shall discriminate against an individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee,

unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity," and "denying employment opportunities to a[n] . . . employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(A)-(B)."

*Austin v. Fuel Sys., LLC*, 379 F. Supp. 2d 884, 904-05 (W.D. Mich. 2004).

(77)

The Plaintiffs are disabled and qualified for positions and programs with or without accommodations, but were denied and mistreated while the Defendants were aware of their disabilities.  The Defendants failed to eradicate discrimination against their disabled students and staff despite the Plaintiffs complaints.

(78)

## COUNT VI. VIOLATION OF THE REHABILITATIVE ACT

**Defendants – *Countryside Academy, Berrien RESA, Benton Harbor Area Schools, Olivia McCrevan, Sarah Brookshire, and Robert Cook***

Plaintiffs reallege paragraphs 1-77.

(79)

The Defendants violated the Rehabilitative Act when they denied the Student and Parent-Plaintiffs access to special education support programs and maintained a hostile learning environment that prohibited the students from receiving a free and appropriate public education.

(80)

"No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted

to such committees. (b) "Program or activity" defined: For the purposes of this section, the term "program or activity" means all of the operations of- (1) (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government" 29 U.S.C. § 794.

(81)

"The elements of a Rehabilitation Act claim are largely similar to those of an ADA claim, with the additional requirement that the defendant be shown to receive federal financial assistance." *McPherson v. Michigan High School Athletic Ass'n*, 119 F.3d 453, 463 (6th Cir. 1997).  The Plaintiff submits that the Defendants special education funding is derived from "federal financial assistance."

(82)

The Defendants violated the Rehabilitative Act when they exposed the Defendants to hostile environments, verbal abuse, bullying, harassment, and assaults because of their disabilities.

(83)

## COUNT VII. EQUAL PROTECTION VIOLATIONS & GROSS NEGLIGENCE –CUSTOM OF HABITUAL VIOLATIONS OF THE MATT EPLING SAFE SCHOOLS LAW (M.C.L. 380.1310b)

**Defendants – *Countryside Academy, Berrien RESA, Benton Harbor Area Schools, Olivia McCrevan, Sarah Brookshire, and Robert Cook***

Plaintiff realleges paragraphs 1-82.

(84)

The Defendants acted in gross negligence by establishing a custom of unreasonably dangerous, hostile, and mismanaged work and learning environments that habitually operated in violation of the Matt Epling Safe Schools Law by participating in, acquiescing to, and circumventing the reporting of bullying in public schools.

(85)

For instance, in violation of Michigan law, the Defendants failed to establish and abide by the following standards and policies: "(5) A policy adopted pursuant to

subsection (1) shall include at least all of the following: (a) A statement prohibiting bullying of a pupil. Not later than October 1, 2015, this statement shall be modified as necessary to comply with 2014 PA 478 including, but not limited to, the inclusion of cyberbullying as a form of bullying.(b) A statement prohibiting retaliation or false accusation against a target of bullying, a witness, or another person with reliable information about an act of bullying.(c) A provision indicating that all pupils are protected under the policy and that bullying is equally prohibited without regard to its subject matter or motivating animus… (g) A procedure for reporting an act of bullying. (h) A procedure for prompt investigation of a report of violation of the policy or a related complaint, identifying either the principal or the principal's designee as the person responsible for the investigation. (i) A procedure for each public school to document any prohibited incident that is reported and a procedure to report all verified incidents of bullying and the resulting consequences, including discipline and referrals, to the board of the school district or intermediate school district or board of directors of the public school academy on an annual basis. (j) An assurance of confidentiality for an individual who reports an act of bullying and procedures to safeguard that confidentiality." Mich. Comp. Laws § 380.1310b(5).

(86)

"An equal protection violation is established by a demonstration of discriminatory intent and discriminatory effect." *Phifer v. City of Grand Rapids*, 657 F. Supp. 2d 867, 874 (W.D. Mich. 2009).  "In establishing a *prima facie* case under the Equal Protection Clause, Plaintiffs must prove that Defendant *intentionally* discriminated against them — mere discriminatory effect or impact is insufficient. " *Thornton v. City of Allegan*, 863 F. Supp. 504, 508 (W.D. Mich. 1993).  The Defendants intentionally discriminated against the plaintiffs by participating in bullying, harassment, conversion of personal property, and circumventing reporting rules due to racial and disability animus. The Defendants acted out gross negligence by establishing and maintaining egregious customs racial and disabled person animus.

(87)

## COUNT VIII. FIRST AMENDMENT FREEDOM OF RELIGION VIOLATION AND FREE SPEECH RETALIATION

**Defendants – *Countryside Academy, Juliana Paustian, Olivia McCrevan, Sarah Brookshire, and Robert Cook***

57

The Defendants violated the First Amendment rights of Plaintiffs Lisa Bates, J.S., and Shanice Harmon when they pressured J.S. to identify as homosexual in contravention of his Christian faith practices, forced him to stop speaking about God with consenting and unbothered peers in his free time, and retaliated against him with selective enforcement of school rules and policies and acquiescing to his mistreatment.  The Defendants retaliated against Ms. Harmon for speaking out and complaining to Berrien RESA superiors about her hostile and mismanaged work environment at Countryside Academy.

(88)

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law;nor deny to any person within its jurisdiction the equal protection of the laws…. "SECTION. 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV.

(89)

"No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation." Mich. Comp. Laws § 2.  "Every person shall be at liberty to worship God according to the dictates of his own conscience. " Mich. Comp. Laws § 4.  "Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech" Mich. Comp. Laws § 5.

(90)

"To survive a motion to dismiss on his First Amendment retaliation claim, plaintiff must adequately plead that he: (1) engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated, at least in part, by his protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999).  The Plaintiffs were engaged in protected conduct by responsibly speaking about God without causing disruption to school activities and confiding

in a work superior about bullying, harassment, and the operating status of federally

funded special education programs when they were abused by the Plaintiffs in

retaliation for exercising their fundamental Constitutional rights.

(91)

## DAMAGES

"It should be kept in mind that the plaintiffs base their present action for money

damages on the Federal civil rights statutes and that those statutes give a right of

civil action only for deprivation of rights, privileges, and immunities secured by

the Constitution and laws of the United States." See Tenney v. Brandhove, 341

U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019; Screws v. United States, 325 U.S. 91, 108,

65 S.Ct. 1031, 89 L.Ed. 1495; *Smith v. Jennings*, 148 F. Supp. 641, 645 (W.D.

Mich. 1957).  "Where legal rights have been invaded, and a federal statute provides

for a general right to sue for such invasion, federal courts may use any available

remedy to make good the wrong done." *Bivens,*403 U.S. at 396, 91 S.Ct. 1999,

quoting *Bell v. Hood,*327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

*Airtrans, Inc. v. Mead*, 389 F.3d 594, 598 n.3 (6th Cir. 2004).  The Plaintiffs have

suffered cruel racial animus, blatant discrimination in federally funded special

education programs, habitual bullying, and egregiously hostile learning and work environments.  The Plaintiff also seeks relief in equity.

(92)

**RELIEF REQUESTED**

Plaintiffs, realleges paragraphs 1-91.

(93)

As a result of the constitutional, federal act, and state law violations suffered by the Plaintiffs and caused by the Defendants, Ms. Harmon, Mrs. Young, Ms. Slaughter, Mrs. Bates and their disabled students have suffered lost funds, mental anguish, humiliation, outrage, anxiety attacks, depression, headaches, loss of sleep, fatigue, physical pain, and emotional distress.

(94)

**Wherefore**, the Plaintiff respectfully requests that this Honorable Court enter a Judgment in her favor against Defendants for the following relief:

I.    That $5,500,000.00 be paid in compensatory and hedonic damages to the Plaintiff to compensate him for the mental and physical anguish, loss of enjoyment, and depression he has and will continue to endure;

II.    That $7,250,000.00 be paid in exemplary damages to the Plaintiffs for the Defendants' violations of public trust and offensive affronts to the conscience of the community;

III.    That $250,000.00 be paid as an award of interest, costs, and reasonable attorney fees;

IV.    Totaling thirteen million dollars ($13,000,000.00)

V.    Any other compensatory, exemplary, or equitable relief that this Honorable Court deems appropriate at the commencement of trial.


**THE J.R. BEASON FIRM, PLLC.**
Attorney John R. Beason III
for the Plaintiffs.


Dated: February 3rd, 2025        By:  /s/ John R. Beason III, Esq.
The J.R. Beason Firm PLLC.
D.C. Bar No.: 1721583
IBA Bar No.: 1522438
853 McAlister Ave.
Benton Harbor, MI 49022
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

SHANICE HARMON,
Individually; LISA BATES,
Individually, and as Next
Friend for J.S.; LATORIA
SLAUGHTER, Individually,
and as Next Friend for M.S.;
BRENDA YOUNG, Individually,
and as Next Friend for A.P.

      Plaintiffs,                                   Case No.

v.                                              Hon. Chief Judge Hala Jarbou

COUNTRYSIDE ACADEMY;
BERRIEN RESA; BENTON
HARBOR AREA SCHOOLS;
AMERGIS STAFFING INC.;
BENTON CHARTER TOWNSHIP;
JULIANA PAUSTIAN, Individually
and in her Official Capacity; SARAH
BROOKSHIRE, Individually and in
her Official Capacity; ROBERT
COOK, Individually and in his Official
Capacity; OLIVIA MCCREVAN,
Individually and in her Official Capacity;
MARIA WOODRUFF, Individually and
in her Official Capacity; ELIZABETH
POCKRANDT, Individually and

63

in her Official Capacity; STEPHEN
G. CHAFFIN, Individually and in his
Official Capacity; Any as yet to be
Discover Parties.

     Defendants.

---

## **JURY DEMAND**

To the extent that a jury trial is allowed with regard to any of the issues as set forth above, Plaintiff mercifully demands such.

**THE J.R. BEASON FIRM, PLLC.**
Attorney John R. Beason III
For the Plaintiffs.

Dated: February 3rd, 2025

By: /s/ John R. Beason III, Esq.
Attorney John R. Beason III
D.C. Bar No.: 1721583
IBA Bar No.: 1522438
853 McAlister Ave.
Benton Harbor, MI 49022
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com